**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOAN LANDRY, | ) | |
| | ) | Case No. 17 CV 8499 |
| Plaintiff, | ) | |
| | ) | Judge Joan B. Gottschall |
| v. | ) | |
| | ) | |
| ABBOTT LABORATORIES, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joan Landry ("Landry") brought this action against her employer, Abbott

Laboratories ("Abbott"), alleging employment discrimination and retaliation claims under the

Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634 and the Americans with

Disabilities Act (ADA), 42 U.S.C. §§ 12101–12213.  Abbott's motion for summary judgment is

before the court.  The facts discussed in the briefing span the six years between 2012–18.

Landry offers that many of these facts as background for the decision on which her claims focus:

the denial in late 2015–early 2016 of her application to be promoted to Director of Crisis

Management.  For the reasons that follow, the court denies the motion for summary judgment.

### I.  Summary Judgment Standard and Local Rule 56.1 Fact Statements

#### A.  Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  In resolving summary judgment motions, "facts must be viewed in the light

most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, the nonmoving party–but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Blasius v. Angel Auto., Inc.*, 839 F.3d 639, 644 (7th Cir. 2016) (citing *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)).  After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 250 (quotation omitted); *see also Modrowski*, 712 F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (*e.g.,* produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted).

## B.  The Local Rule 56.1 Statements

In its reply, Abbott briefly asserts that the court should disregard Landry's statement of additional facts "to the extent it violates Local Rule 56.1."  Reply in Support of Summary Judgement ("Reply") 3, ECF No. 80.  Local Rule 56.1 creates a procedure for presenting facts the parties contend are material.  Specifically, Local Rule 56.1(a)(3) requires a party moving for summary judgment to submit "a statement of material facts as to which the moving party contends there is no genuine issue and that entitles the moving party to judgment as a matter of law."  *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) (citing L.R. 56.1(a)(3)).

Each paragraph of the movant's fact statement must include "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." L.R. 56.1(a). The "[f]ailure to submit such a statement constitutes grounds for denial of the motion." *Id*.

Local Rule 56.1(b)(3) requires the nonmoving party to submit a response to each statement of fact provided by the movant, "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(B). The nonmoving party may also present a separate statement of additional facts "consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon." L.R. 56.1(b)(3)(C).

This court's standing order on motions for summary judgment (available from the court's website) specifies how factual assertions, arguments about the reasonableness of inferences to be drawn from cited materials, and other legal arguments should be distributed among the Local Rule 56.1 fact statements, responses, and legal memoranda. Regarding a response to a fact statement, the order (p. 2) states "Local Rule 56.1(b)(2) requires a memorandum of law. This is the document in which all argument should be contained."

Abbott identifies two categories of alleged Local Rule 56.1 violations. First, Abbott cites paragraphs 14 and 16[1] of Landry's statement of additional facts as being so lengthy and complex that they violate the requirement that the fact statement "consist[] of *short* numbered paragraphs." L.R. 56.1(b)(3)(C) (emphasis added).

---

[1] Abbott's citation indicates that paragraphs 14 and 16 are examples of excessively long paragraphs. The court's review of Landry's statement of additional facts suggests that there may be more such paragraphs. Without specific objection from Abbott, the court declines to take the step of attempting to determine on its own which, if any, other paragraphs violate Local Rule 56.1, particularly considering that this argument is raised in a reply.

The court agrees.  By the court's count, paragraph 16 consists of eight complicated sentences followed by a string of citations to summary judgment materials.  *See* ECF No. 60 at 12–13.  Paragraph 14, which is similar to paragraph 16, is reproduced in full below:

> 14.  Landry testified that she received little if any communication or guidance about expectations for the GCC Manager position.  Ms. Pearson testified that she had multiple communications with Ms. Landry about expectations; however, a packet of emails, notes and memoranda supposedly reflecting such communications she sent to Ms. Olson contained no communications about expectations.  Ms. Pearson had no recollection of ever providing a job description for the GCC Manager position to Ms. Landry.  Ms. Pearson indeed worked with Ms. Olson on, and they prepared a memorandum containing a comprehensive list of expectations for the job that Mr. Graves acknowledged would be helpful to a person moving into the position.  Drafts of the memorandum produced in discovery are dated February 19 and February 28, 2015.  Ms. Pearson falsely insisted at her deposition that the memorandum had been given to Ms. Landry; Ms. Olson confirmed that an intentional decision was made not to provide the memorandum to her.  Mr. Graves was unable to provide any answers to Ms. Landry's questions about expectations in the GCC Manager role.  Instead he told her things like "you just don't get it" and "it's leadership 101."  P. Tab 1 (Landry Dep. 58:4-11, 82:7-83:3, 138:12-139:6, 153:4-8); P. Tab 1-B (Landry Dep. Ex. 3 at 190); P. Tab 6 (Graves Dep. 76:5-78:10); P. Tab 6-A (Graves Dep. Ex. 5); Tab 11 (Pearson Dep. 68:1-73:9); P. Tabs 11-D, 11-E (Pearson Dep. Exs. 6, 7); P. Tab 5 (Olson Dep. 110:8-13, 101:10-102:20); P. Tab 5-G (Olson Dep. Ex. 14); P. Tab 5-H (Olson Dep. Ex. 15).

ECF No. 60 at 11.  Paragraphs like this create two problems for the court and the party who must respond.  First, one must disentangle argument from the facts supported by the record and from the inferences to be drawn from the facts.  The sentences of paragraph 14 jump from one witnesses' testimony to another and then to exhibits in an effort to weave together a factual argument.  However, the thicket of argument obscures the ultimate factual proposition plaintiff is attempting to establish.

The second problem relates to the first.  Because the citations have been gathered at the end of the paragraph, one must comb through each citation and attempt to match the cited deposition, affidavit, or exhibit with a portion of the paragraph.

Including such lengthy, argumentative paragraphs defeats the purpose of the Local Rule 56.1 fact statements, which is to assist the court and the parties by "ensur[ing] the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). "Generally, when the presentation becomes more confusing than efficient, as when the facts in a single paragraph are jumbled or disjointed, appear to be non sequiturs, or their connection must be explained by an improper argument, Local Rule 56.1 requires the paragraph to be split." *Rivera v. Guevara*, 319 F. Supp.3d 1004, 1019 (N.D. Ill. 2018) (Gottschall, J.)) (quotations omitted). In accordance with this general principle, the court strikes paragraphs 14 and 16 of Landry's Local Rule 56.1(b)(3) statement of additional facts because they make improper arguments and because they violate the Local Rule's requirement that the paragraph be "short." L.R. 56.1(b)(3)(C).

Abbott also argues, in a single sentence of its reply, that several paragraphs of Landry's statement of facts mischaracterize the record, are not supported by the cited material, rely on hearsay, or assert facts for which a declarant or deponent lacks personal knowledge. Reply 3–4, ECF No. 80 (citing Response to Statement of Facts ("Resp. to SOF") ¶¶ 2, 6, 7, 8 13, 14, 19, 20, 21, 28, 30, 32, 35, 37). Instead of developing these arguments in the briefing, as this court's standing order requires, Abbott merely cites legal arguments and objections made in its response to Landry's statement of additional facts. *See id.*

Abbott cannot bootstrap the improper arguments in its Local Rule 56.1(b)(3) response by incorporating them by reference into its reply brief. The court notes that Landry's response to Abbott's Local Rule 56.1(a)(3) fact statement also includes hearsay arguments and arguments

that the material cited does not support the factual assertion.[2]  ECF No. 61 ¶¶ 7, 8, 10, 25, 29, 31.

As this court has recently reiterated,

> By objecting or including an argument in a response to a Local Rule 56.1(a)(3) response, the party resisting summary judgment deprives the moving party of the chance to reply.  Including arguments in a Local Rule 56.1(b)(2) memorandum of law or in a separate motion to strike avoids these problems by permitting full adversary presentation.

*Brownlee v. Catholic Charities of the Archdiocese of Chi.,* 2020 WL 977968, at *3 (N.D. Ill. Feb. 28, 2020) (Gottschall, J.) (citing *Tabiti v. LVNV Funding, LLC,* 2019 WL 1382235, at *3 (N.D. Ill. Mar. 27, 2019) (Gottschall, J.)).  The Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings."  *Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (citation omitted).  In the case at bar, the parties raise numerous, often complex arguments in their Local Rule 56.1 responses.  The court therefore exercises its "discretion to adjudicate the summary judgment motions by disregarding all improper arguments made in the Local Rule 56.1 fact statements, deeming facts undisputed where appropriate."  *Brownlee*, 2020 WL 977968*, *4 (citing *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 359–60 (7th Cir. 2009)).

Additionally, some paragraphs of the parties' Local Rule 56.1 responses assert additional facts that go well beyond the scope of the paragraph to which the party is responding.  The court declines to consider these responses to the extent they introduce additional facts not also found in a paragraph of Abbott's Local Rule 56.1(a)(3) statement of facts or Landry's Local Rule 56.1(b)(3) statement of additional facts.  *See Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809–10 (7th Cir. 2005); *Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004).

---

[2] Counsel also objects that the exhibit cited in ¶ 51 is the wrong exhibit and then helpfully provides the correct citation.  *See* Resp. to SOF ¶ 51.  The court thanks counsel for their assistance.

Finally, Landry foregoes a factual recitation in her memorandum opposing summary judgment.  She incorporates her entire statement of additional facts.  Beneath the heading statement of facts: "Plaintiff respectfully directs the Court's attention to PSOF ["Plaintiff's Statement of Facts"] and to her responses to the allegations of Defendant's Local Rule 56.1 Statement ("DSOF") as her Statement of Facts."  ECF No. 62 at 4.

Local Rule "56.1 statements do not abrogate a party's obligation to recite its version of the facts in its supporting memorandum; it is inappropriate in one's memo to simply refer the Court to the 56.1 statement."  *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000).  The court therefore considers only the specific portions of the Local Rule 56.1 fact statements plaintiff cites in the analysis section of her memorandum beginning on page six.  *See id*. at 586*; see also Ammons,* 368 F.3d at 818 ("[A] court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity." (citations omitted)); *Mervin*, 142 F. Supp. 3d at 366–67 (discussing the role the fact statements play in the summary judgment process).

## II.  Facts

Having analyzed the parties' briefs and fact statements, the court turns to the task of summarizing the facts.  The court views the facts in the light most favorable to Landry, drawing all reasonable inferences in her favor.  *See Rowlands v. United Parcel Serv.– Ft. Wayne*, 901 F.3d 792, 795 (7th Cir. 2018) (citing *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014)).  Again, the parties have submitted voluminous fact statements spanning events occurring over more than six years.  To repeat, Landry's claims focus primarily, but not exclusively, on the denial of her application in 2015 to be promoted to the role of Director of Crisis Management.

## A. Background Facts

A graduate of the U.S. military academy at West Point, Landry served as an officer in the U.S. Army before joining Abbott. Response to Statement of Additional Facts ("Resp. to SAF") ¶ 1. "She has the disability, partially service related, of severe and progressive hearing loss, a matter about which she has been open throughout her years at Abbott." Resp. to SAF ¶ 1. Between 2014–18, Landry was 48–52 years old. *Id.*

Landry began her career at Abbott in 1997 working in the nutrition group. Resp. to SOF ¶ 5. In 2000, she transferred from Abbott's facility in Virginia to Columbus, Ohio, where she held the title of Business Manager until 2009. *Id.* ¶ 6. In 2009, Landry transferred to Abbott's facility in Abbott Park, Illinois, where she assumed a new role in Abbott's "Crisis Management and Business Continuity function, which assists Abbott's business units with preparing for, training for, and managing through natural and man-made disasters." Resp. to SAF ¶ 2. Landry has been certified as a Master Business Continuity Practitioner, and as an Associate Fellow of the Business Continuity International accrediting organization. *Id.*

Abbott promoted Landry to Business Continuity Program Manager (sometimes "program manager") when she transferred to Abbott Park in 2009. Resp. to SOF ¶ 8. Abbott assigns job roles a numerical pay grade. Landry's program manager role was a grade 20 position. Resp. to SAF ¶ 8; Resp. to SOF ¶ 9. Abbott classified the program manager position as an "individual contributor" role, meaning that Landry did not manage others. Resp. to SOF ¶ 9. Landry initially reported to Jim Murphy who in turn reported to Corlis Murray ("Murray"), Abbott's Senior Vice President for Quality Regulatory and Engineering Services.[3] *See* Resp. to SOF

---

[3] Abbott cites evidence that Murray believed that there may have been some concerns about Landry's leadership skills when she worked at Abbott nutrition. *See* Resp to SOF ¶ 7. Murray could not recall the details. *See id.* The

¶¶ 7–8; Resp. to SAF ¶ 8.  Beginning in 2012, Landry reported to Joseph Robinson ("Robinson"), Abbott's former Director of Crisis Management.  *See* Resp. to SAF ¶ 3.  As discussed below, Robinson's role in supervising and evaluating Landry in 2015 is the subject of a dispute.  *See id.* ¶ 6.

One additional Abbott employee plays a prominent role here.  Robert Graves ("Graves"), Abbott's Senior Director of Global Security, was the hiring manager for the Director of Crisis Management position Landry sought in 2015.  *See id.* ¶¶ 5, 7.

As far as the court can tell from the record, Abbott has, or least had at the pertinent times, separate Human Resources and ("HR") and Employee Relations ("ER") divisions.  *See* Resp. to SOF ¶¶ 14–15.  Abbott reviews employees' performance once each calendar year.  Resp. to SAF ¶ 4.

### B. 2010–14

At some point between 2010–12, Abbott provided Landry with a headset to help her hear during telephone conferences.  Resp. to SOF ¶ 10.  When participating in conferences, Murray sometimes muted the microphone in the room, making it impossible for Landry to hear.  *Id.* (citing Landry Dep. 127:2–23, Pl.'s Ex. 1, ECF No. 63.[4]  Even when she was reminded of Landry's needs, Murray would still mute the microphone.  Landry Dep. 137:11-15.  Landry was asked at her deposition whether she thought Murray acted intentionally.  Landry responded, "I

court declines to explore the significance if any, of these facts because the parties do not discuss them in their briefing.

[4] The parties combine their respective summary judgment exhibits into large "compendia" with tabs in the courtesy copies.  The electronic copies of the compendia filed with the CM/ECF system cannot be readily searched by tab number, making locating citations to tab numbers a labor-intensive exercise.  Accordingly, the court cites the exhibits by name and includes a reference to the CM/ECF "Page ID" number on which the exhibit can be found.  The court has also included in these citations a reference to the ECF document number and the Page ID on which the exhibit begins. For instance, the notes cited as "Tab 6-J," which is itself an exhibit to a deposition, begins on Page ID #1600 of ECF No. 64.  The court lists this cite as Emails dated Sept. 29, 2016, ECF No. 6 at #1600.

am not thinking that it was personally intentional so much as the fact that [Murray] should not be inconvenienced by my issues." Landry Dep. 137:18-20.

On July 24, 2014, Landry attended an informal employee "roundtable" at which Murray spoke. Resp. to SAF ¶ 17; Resp. to SOF ¶¶ 13–14. In response to another Abbott employee's question about hiring in the skilled trades, Murray said, "Don't go telling HR on me . . . but you do not replace a mature worker with a mature worker." Resp. to SAF ¶ 18 (ellipsis in original) [5] ("Undisputed that Murray made the quoted comment."). Landry recorded this statement in handwritten notes made shortly after the meeting. *See* Landry Dep. 39:16-40:6, ECF No. 63 at #925; Resp. to SAF ¶ 18; *see also* Resp. to SOF ¶ 14 (Murray's testimony that she does not recall saying anything like the quoted statement). Landy did not follow up on these comments with Murray. Nor did she report Murray's comments to ER until February 2015. *See* Resp. to SOF ¶¶ 15, 32.

Robinson gave Landry favorable annual reviews for 2013–14 (her 2015 is discussed below). *See* Resp. to SAF ¶¶ 4–5. He gave her the highest possible overall rating then permitted in 2013, "EE" for exceeds expectations. *Id.* ¶ 4. In 2014, Robinson rated Landry "Best in Abbott" in the competencies "Anticipate-Leader," "Deliver Results-Leader," and "Innovate-Leader." *Id.* ¶ 5.

### C. Landry's Management of Abbott's Global Communications Center (Jan.–Feb. 2015)

"While employed as a Program Manager under Robinson, Landry told Graves and Robinson that she wanted to lead an organization for her career progression." Resp. to SOF ¶ 17 (undisputed). In late 2014, Robinson suggested to Graves that Landry would be a good fit for an open position managing Abbott's Global Communications Center ("GCC"). *Id.* ¶ 18. The GCC

---

[5] The ellipsis in the quote indicates a long pause on Murray's part.

"is the initial point of contact for calls about emergencies ranging from elevator entrapments to natural disasters." Resp. to SAF ¶ 8.

Despite the leadership opportunity it offered, the parties agree that Landry did not want the job; Graves approached her and asked her to take the position to allow the outgoing GCC manager to move to another role. *Id.* The role was not a grade 20 position (Landry's pay grade at the time), but her pay and benefits did not decrease. *Id.*; Resp. to SOF ¶ 19.

Landry began managing the GCC on January 16, 2015. Resp. to SAF ¶ 8. She reported to Jean Pearson ("Pearson"). *Id.* Pearson reported to Graves. Resp. to SOF ¶ 20. Early in her tenure, Landry informed Pearson that she "had a hearing impairment." *Id.* ¶ 21. Landry was eventually removed from the GCC manager role and returned to her prior program manager position, at the same pay and grade, on March 18, 2015. *Id.* ¶ 34.

Graves privately considered Landry's management of the GCC to be a "make or break" assignment for Ms. Landry to prove herself as a manager. Resp. to SAF ¶ 8. Viewing the entire experience in retrospect, Landry testified that she felt that she was set up to fail. *See id.* ¶ 15.

Many of the facts leading to Landry's removal are disputed. Resolving disputes in Landry's favor, Landry paints a picture of Pearson's hostility beginning on the day she started at the GCC. *See* SAF ¶¶ 9–10. Pearson commented on the difficulties Landry's hearing loss created. *See id.* ¶ 9. Landry, Pearson explained, would have to use a walkie-talkie radio, the telephone, and the radio, but Pearson offered no solutions or possible accommodations. *See id.* ¶ 10. Pearson would also "make faces and roll her eyes" on occasion when Landry asked her to speak more loudly. *Id.* ¶ 10.

Pearson directed Landry to undergo the same full-time training as a GCC analyst, so she could learn the GCC's practices and procedures. Resp. to SOF ¶ 22. Pearson met with Landry

six days after she started at the GCC, on January 21, 2015. *Id.* ¶ 27. The two met "to discuss performance issues, including changes to the GCC, accepting feedback, and working with Global Security to provide support." *Id.* (subject of meeting deemed undisputed; no material cited to demonstrate existence of dispute). Pearson considered Landry's response at the meeting to be aggressive and argumentative. *Id.*; *see also* Notes dated Jan. 21, 2015 at 8682, ECF No. 64 at #1658 (Pearson's notes from this meeting). Landry points to Robinson's testimony that one could perceive Landry to be aggressive because her hearing loss sometimes causes her to talk loudly, and the volume of Landry's voice contributed to Pearson's belief that Landry was aggressive. *See id.*; Resp. to SAF ¶ 13.

On February 6, 2015, Pearson accused Landry of being "insubordinate" and spoke with Graves about her "frustrations" with Landry. Resp. to SOF ¶ 29. The insubordination allegation concerned Landry's alleged failures to attend full-time training and supposed efforts to change a flow chart in the GCC without Pearson's approval. Landry denies these accusations and points to her own testimony that Pearson approved the changes she was making. *See id.* ¶¶ 24–26; Resp. to SAF ¶ 15.

Beth Olson ("Olson"), an ER employee, investigated Pearson's concerns about Landry's performance and Landry's allegations of age and disability discrimination. Resp. to SOF ¶¶ 35–36. Olson met with Landry, Graves, Murray, Pearson, and several of Landry's subordinates in February 2015. *See id.* ¶¶ 30, 35–36; Resp. to SAF ¶¶ 11–12. Olson met with Landry on February 11, 2015. Resp. to SOF ¶ 30. That same day, Graves met with Landry and, in Landry's version of the facts, said that Murray did "not like" Landry, did not want Landry leading people, and Graves "was starting to understand why." Landry's notes at 182, ECF No. 63 at #965. (Landry's handwritten notes).

The record contains Olson's notes from her February 13, 2015,[6] interviews with two of Landry's subordinates, GCC shift supervisors Brad Nix ("Nix") and Jessica Cottrell ("Cottrell"). The notes are written in a question-and-answer format, but they do not purport to be transcripts. And it is unclear whether Olson posed the questions or the questions reflect the conversations' informal progression. Nix and Cottrell expressed a number of concerns about Landry, her hearing loss among them.

The notes of Nix's interview state that he thought Landry was "argumentative." Notes dated Feb. 13, 2015, at 252, ECF No. 64 at #1408. Nix also expressed concerns that Landry was not paying attention during training, that she was more concerned with "put[ting] her stamp" on things than with learning, that she gossiped about Abbott executives, and that she spent an inordinate amount of time on her personal cell phone and attending to personal matters. *See id.* at 251. The notes state the "the big thing that really bothered" Nix was that Landry took two half days off work in a week in which she also took a two-hour lunch. *Id.* at 252. The notes also include a question about "problems" with Landry's hearing loss. *Id.* The response reads, "Our last manager kept a radio at his desk. We have a tone out function. If the GCC does something wrong, he could come in and correct us." *Id.*

Cottrell expressed many of the same concerns as Nix. *See* Notes dated Feb. 13, 2015, at 264, ECF No. 64 at #1414. Viewed favorably to Landry, the notes of Cottrell's meeting with Olson recount that issues related to Landry's hearing loss were "bothering" Cottrell because Landry seemed to be able to hear somethings and not others. *Id.* at 267. Cottrell felt that she needed clarification of what Landry could and could not hear to avoid being accused of "picking on" Landry. *Id.*

---

[6] Olson's notes regarding Nix's interview are dated January 13, not February 13. This appears to be a typographical error.

It is undisputed that Nix, Pearson, and Cottrell communicated information to Graves which he used to reach his decision to remove Landry. *See* Resp. to SAF ¶ 13. Although the parties do not cite evidence of what was said to Graves, it would be reasonable to infer that Nix and Cottrell communicated the concerns captured in Olson's notes.

Graves and Pearson met with Landry on February 20, 2015. Resp. to SAF ¶ 12; Resp. to SOF ¶ 32. At the meeting, Graves informed Landry that she was "not going to make it" as manager of the GCC. Resp. to SAF ¶ 13. Graves also characterized Landry as "eccentric" and said that she "thought differently from other people." *Id.*

Three days later, Landry sent Olson an email about the February 20, 2015, meeting. Resp. to SOF ¶ 32 (citing Email dated Feb. 20, 2015, ECF No. 64 at #1404. In her message, Landry expressed her concerns that Graves's comments that she was "eccentric," "different," and "not a leader of people" referred to her hearing impairment. *Id.* Landry also raised concerns about age discrimination, referencing Murray's July 24, 2014, comments about "mature workers" discussed above. *Id.*

Pearson, Olson, and Olson's supervisor, Lauren Hennessy, met with Landry on March 16, 2015. Resp. to SOF ¶ 33. Among other things, Pearson told Landry that managers and supervisors in the GCC were complaining about her, and Pearson again stated that she considered Landry to be confrontational. *Id.* Landry was moved to her prior program manager role two days later. *Id.* ¶ 34.

### D. Application for Director of Crisis Management (Oct. 2015–Jan. 2016)

For the rest of 2015, Landry again reported to Robinson in her program manager role. Resp. to SOF ¶ 37. Robinson left Abbott for another opportunity at the end of 2015. *Id.* ¶ 38; Resp. to SAF ¶ 24.

Abbott advertised Robinson's job, Director of Crisis Management, to internal and external candidates. Resp. to SOF ¶ 44; Resp. to SAF ¶ 24. More than 150 people applied, including Landry. Resp. to SOF ¶ 45. Abbott classified the position as grade 21, one level above Landry's pay grade at the time.[7] *See id.* ¶ 48.

Graves asked Robinson to review the resumes of candidates for his job, and he sorted Landry's resume into the "A" category, meaning that he considered her to be among the strongest candidates. Resp. to SAF ¶ 7. Robinson testified that he did not consider the person ultimately hired to be qualified. *Id.* ¶ 27.

Abbott hired Maria Stone ("Stone"), then the Director of Abbott's Business Risk Intelligence Group. Resp. to SOF ¶ 46. "Stone had no prior experience in developing strategies specific to crisis management, no experience with the oversight of development of crisis management plans, no prior experience corporate oversight of policies related to crisis management; and no involvement in assessing whether Abbott's business units met the metrics for compliance with Abbott's crisis management policies." Resp. to SAF ¶ 27 (undisputed facts). In her then-existing role, Stone oversaw the GCC. Resp. to SOF ¶ 46. Rather than fill the job as advertised Graves proposed combining Stone's existing responsibilities with the Director of Crisis Management role. *Id.* It is undisputed that Stone is 15 years younger than Landry, that she does not have a disability, and that she had not engaged in any protected activity. Resp. to SAF ¶ 7.

At his deposition, Graves testified that he believed that Stone had the needed "leadership skills" and that she could learn the "technical aspects" on the job. Resp. to SOF ¶ 47 (quoting Graves Dep. 206:22-208:8, ECF No. 55-2 at #726). At another point during his deposition,

---

[7] Maria Stone, the person selected for the position, was already at grade 21; she became eligible for an Abbott bonus program as a result of the transfer. Resp. to SOF ¶ 48.

Graves testified that Stone was "a nonentity, meaning that she had a good relationship with [Murray]. Good relationship with [Pearson] and could have a good relationship with myself." Graves Dep. 159:21–24, ECF No. 64 at #1508. Murray accepted Graves's proposal to combine Stone's then-current role with the Director of Crisis Management role, and Stone approved. Resp. to SOF ¶¶ 46–47; *see also* Resp. to SAF ¶ 7 (undisputed that Graves "consulted" with Murray before hiring Stone).

### E. Landry's 2015 Performance Review (Nov.–Dec. 2015)

Landry applied for the Director of Crisis management role on November 5, 2015. Resp. to SAF ¶ 24. While her application was pending, Robinson completed Landry's 2015 annual performance review; he entered it in Abbott's computer system on December 2, 2015. *Id.* Landry accepted the review and "closed" it in Abbott's computer system (the meaning of closing the review is not explained). *Id.*

A jury could view Robinson's initial review as quite positive. Robinson rated Landry "Best in Industry" in her "Functional Competencies" and "Best in Abbott" in "Anticipate-Leader," "Build-Leader," "Deliver Results-Leader" and "Abbott Competencies." Resp. to SAF ¶ 6. He stated that she achieved 100% of her goals and praised her contributions at Abbott. *See id.*; *accord* Resp. to SOF ¶ 37.

Landry forwarded Robinson's review to Graves. Resp. to SAF ¶ 24. In her email, she asserted that the review strengthened her candidacy for the Director of Crisis management position. *Id.* Graves subsequently met with Landry. *Id.* At the meeting, he said that Robinson's assessment was "totally inaccurate and over the top." *Id.* Referring to Landry's tenure managing the GCC, Graves also said that he could have had Landry fired. *Id.*

Graves drafted changes to Landry's 2015 performance review; he substituted or added his own comments and ratings for Robinson's based on his experience with Landry in the GCC. Resp. to SAF ¶ 25. Landry's initial self-assessment for 2015 did not mention the GCC. Resp. to SOF ¶ 40. And Landry does not dispute that "Robinson told Graves that he could only evaluate Landry based on the experience he had as a manager and if Graves had additional comments to add, he could provide them to Robinson or work with HR to add them after the fact." *Id.* ¶ 39. Graves's initially proposed downgrading some of Landry's ratings in competencies. *See* Resp. to SAF ¶ 25. For instance, he changed the "Best in Abbot" rating for the competency "Build-Leader" to "needs some improvement" and added a comment negatively reflecting on Landry's performance managing the GCC. *See id.* ¶¶ 25, 32. There is evidence that Graves tried to completely overwrite Robinson's review. *See* Resp. to SAF ¶ 25 (citing Landry Decl. ¶ 15). Ultimately, however, Robinson's ratings of Landry on individual competencies and his overall rating of Landry did not change. Resp. to SOF ¶ 41.

### F. April 2016–April 2017

Landry began reporting to Stone in April 2016 when she assumed the Director of Crisis Management role. The two initially had a "strong working relationship." Resp. to SAF ¶ 32; *see also* Resp. to SOF ¶ 49 (Stone "found the relationship to initially be positive.").

Landry considers numerous acts during the ensuing two years to be discriminatory and retaliatory. *See* Resp. to SAF ¶¶ 32–36. Examples include scrutinizing her travel plans and expenses more closely than other program managers, excluding her from meetings, and giving her a quality assurance role in 2017 that she considered to be a "dead end" for her career. *See id.*

In April 2016, Graves set Landry's individual adjustment award for her Long-Term Incentive ("LTI") payment at 95%. *Id.* ¶ 33. In previous years, Landry's adjustment had been set at 100%. *Id.* Landry considered this action to be a "shot across the bow." *Id.*

Later in 2016, Landry reluctantly decided to undergo cochlear implant surgery because she believed that her hearing loss was negatively impacting her career at Abbott. Resp. to SAF ¶ 34. Landry was reluctant because the procedure is invasive, as it involves drilling into the skull. *Id.* Landry initially scheduled the surgery for December 29, 2016, but she rescheduled to February 2017 at Stone's request. *See id.* Stone asked her to change the surgery date on September 8, 2016, and Landry subsequently learned that changing the surgery date permitted Stone to schedule a family vacation to Hawaii. *See id.* ¶ 36.

Landry told Stone of her decision to undergo surgery on September 8, 2016. *Id.* She explained that she would need to take a modest amount of medical leave to recover. Landry also communicated her concerns about the negative impact her hearing loss was having on her career. *Id.*

After the September 8, 2016, meeting, Stone became much more negative toward Landry. Resp. to SAF ¶ 36. For the first time, Stone sent Landry a formal-sounding email on September 29, 2016; the message which could reasonably be seen as chastising Landry. *See id.* Landry responded to Stone's message. In her response, Landry stated, among other things, "I have a great deal of concern about the timing of [Stone's] email" and reiterated her concerns that Stone's actions came on the heels of Stone learning of the scheduled cochlear implant surgery and Landry's concerns that she was the victim of ongoing discrimination and retaliation. *See* Resp. to SOF ¶ 51–52 (citing Email dated Sept. 29, 2016 at 790, ECF No. 63 at #1318) (plaintiff's response).

Stone forwarded Landry's email to Graves. Resp. to SAF ¶ 28. Regarding Landry, Stone wrote, "Wow! You were correct! I think I should seek an [sic] advice of ER on how best to handle this situation . . . She is trying to use her harassment tactics (discrimination over her hearing issues) on me." *Id.* (quoting Emails dated Sept. 29, 2016, at 8786, ECF No. 64 at #1600). Graves's reply consisted of one word, "yup." *Id.*

That same day, September 29, 2016,[8] Graves "punched" Landry "moderately hard" in the arm. *Id.* ¶ 30. The punch came out of the blue as Landry stood near a copier. *See id.* Graves admits making physical contact with Landry. He testified that he "lightly tapped her" in an effort to get her attention. *Id.*

Landry's surgery and recovery kept her out of work from February 2 through April 2, 2017. Resp. to SAF ¶ 35. Her absence initially caused her to receive a prorated LTI payment for 2017. *Id.* The underpayment cost her approximately $10,000. *Id.* Landry complained to various Abbott employees to no avail. *See id.* "Landry eventually received a 100% LTI award after she informed Abbott's CEO, Miles White, and General Counsel, Hubert Allen, of the issue, and Mr. White referred the issue to Mr. Fussell [Abbot's Senior President of HR]." *Id.*

### G. April 2017–2018

Graves transferred to another position and ceased supervising Landry in 2017. Resp. to SAF ¶ 37. As part of this reorganization, some of Stone's responsibilities were transferred to a newly hired Director of Security; Stone continued to supervise the GCC. *See* Resp. to SOF ¶ 58.

In July 2018, Stone transferred to another role in Abbott, leaving the Director of Crisis Management position open again. Resp. to SAF ¶ 37. Landry applied. While the selection

---

[8] Paragraph 30 of plaintiff's statement of additional facts recites the year of this incident as 2015. However, the exhibit Landry cites, an email message, shows that the incident occurred in 2016. Emails dated Sept. 29, 2016, ECF No. 63 at #1183.

process was ongoing, Landry was offered a new position, at pay grade 21, as a Business Continuity Principal Consultant.  Resp. to SOF ¶ 64; Resp. to SAF ¶ 37.  She accepted.  Resp. to SOF ¶ 67.

Abbott considers Landry's current role to be an "individual contributor" role, and no one reports to Landry.  *Id.*  Landry testified that she continues to believe that this role is discriminatory and retaliatory because Abbott has not given her an opportunity to lead others.  *See* Resp. to SAF ¶ 37.

### H.  Charges of Discrimination

Landry filed two charges of discrimination with the Equal Employment Opportunity Commission.  Resp. to SOF ¶ 69.  The first, filed September 26, 2016, focused on Landry's non-selection for the Director of Crisis management position, alleging retaliation and discrimination based on age and disability.  *Id.*  Landry's second charge, filed May 8, 2017, stemmed from the underpayment of her 2016 LTI payment.  *Id.*

### III. Analysis

Landry brings two distinct types of ADEA and ADA claims: intentional discrimination claims and retaliation claims.  *See generally Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 850–51 (7th Cir. 2019) (discussing the "distinct" types of claims available under the ADA).  All of these claims require proof of an adverse employment action, but, as discussed below, what constitutes adverse employment action varies for each type of claim Landry brings.

To prevail on her ADEA discrimination claim, Landry must show that Abbott "subjected [her] to an adverse employment action because of [her] age."  *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453 (7th Cir. 2011) (citing *Van Antwerp v. City of Peoria, Ill.*, 627 F.3d 295, 297 (7th Cir.

2010)).  Her ADA intentional discrimination claim has similar elements.[9]  *See* 42 U.S.C.

§ 12112(a) (West 2020) ("[n]o covered entity shall discriminate against a qualified individual on

the basis of disability").  Landry must show that: (1) she is a person with a disability, as defined

in the ADA; (2) she is otherwise qualified to perform the essential functions of her job with or

without reasonable accommodation; and (3) the adverse job action was caused by her disability.

*Monroe v. Ind. Dep't. of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (citing *Roberts v. City of

Chi.*, 817 F.3d 561, 565 (7th Cir. 2016)).  To prevail on her retaliation claims, Landry "must

show that [she] engaged in statutorily protected activity, that [she] suffered a materially adverse

action, and that the two are causally related."  *Barton*, 662 F.3d at 456 (citing *Horwitz v. Bd. of

Educ.*, 260 F.3d 602, 612 (7th Cir. 2001)) (age discrimination); *Rowlands v. United Parcel Serv.

Ft. Wayne*, 901 F.3d 792, 801 (7th Cir. 2018) (quoting *Rodrigo v. Carle Found. Hosp.*, 879 F.3d

236, 241 (7th Cir. 2018)) (ADA retaliation claim).

### A. Adverse Employment Actions and Timeliness

Abbott begins by attempting to narrow the universe of facts on which liability may be

based.  Abbott submits that most of the incidents of alleged discrimination and retaliation Landry

discusses are either time-barred or not cognizable adverse employment actions.  *See* Mem. Supp.

Mot. Summ. J. 9–10, ECF No. 53.

---

[9] Landry's ADA claim can be established in three distinct ways: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people."  *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018) (internal citations and quotations omitted).  Although the record contains information on instances of Abbott's alleged failure to accommodate Landry's disability, she makes clear that she brings only the first type of ADA claim here.  Indeed, Landry argues in her response memorandum that the instances of failure to accommodate, going back to 2010, are presented as "background evidence" supporting her claim that Abbott intentionally discriminated against her based on her disability.  Mem. in Opp. to Summ. J. 6–7, ECF No. 62.  This evidence will be discussed in detail in the text *infra*.

In Illinois, employees bringing claims under the ADA and ADEA have 300 days from the "unlawful employment action" to file a charge of discrimination with the Equal Employment Opportunity Commission. *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004) (citing *Hamilton v. Komatsu Dresser Indus.*, 964 F.2d 600, 603 (7th Cir. 1992)). The plaintiff "may pursue only those claims that could reasonably be expected to grow out of the administrative charges." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099–1100 (7th Cir. 2013) (citations omitted); *accord Flannery*, 354 F.3d at 637; *see also Chaidez v. Ford Motor Co*., 937 F.3d 998, 1004–05 (7th Cir. 2019) (discussing this standard further).

For purposes of a claim of intentional discrimination, the Seventh Circuit has recognized three general categories of materially adverse employment actions:

> (1) cases in which the employee's compensation, fringe benefits, or other financial terms of employment are diminished, including termination; (2) cases in which a nominally lateral transfer with no change in financial terms significantly reduces the employee's career prospects by preventing her from using her skills and experience, so that the skills are likely to atrophy and her career is likely to be stunted; and (3) cases in which the employee is not moved to a different job or the skill requirements of her present job altered, but the conditions in which she works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment.

*Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004)). For purposes of a retaliation claim, "the challenged adverse action need not be one that affects the terms and conditions of employment, but it 'must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.'" *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016) (citing *Roney v. Ill. Dep't. of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007)); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62–65, 68 (2006). Stated slightly differently, an employer's action may support a retaliation claim if it "would

make other employees think twice before filing a" charge of discrimination. *Flannery*, 354 F.3d at 643.

Landry narrows the acts for which she seeks to hold Abbot liable in her memorandum opposing summary judgment. For all her claims, Landry relies on Abbott's failure to promote her to Director of Crisis Management in late 2015. Mem. Opp'n. Mot. Summ. J. 7–14, ECF No. 62. "A failure to promote is a discrete act under employment discrimination laws, so each denied promotion can amount to a 'separate actionable unlawful employment practice.'" *Marion Cty. Sheriff's Office*, 942 F.3d at 858 (citing *Morgan*, 536 U.S. at 114) (internal quotation marks omitted). The parties agree that Landry filed a timely charge of discrimination for this failure to promote. *See* Resp. to SOF ¶¶ 34, 69.

Importantly, however, Landry offers her evidence of other acts of alleged retaliation and discrimination as "background." Mem. Opp'n. Mot. Summ. J. 8. The law allows her to do so. Although an untimely discrete action is not "actionable," meaning that it cannot be used to impose liability, "the statute [does not] bar an employee from using the prior acts as background evidence in support of a timely claim." *Nat'l R.R. Passenger Corp.,* 536 U.S. at 113. A plaintiff may, therefore, "look to events occurring prior to the 300–day limitations date" to show that the reasons her employer has given for failing to promote her are pretextual. *Fischer v. Avanade, Inc.*, 519 F.3d 393, 405 (7th Cir. 2008) (citing *Davis v. Con–Way Transp. Cent. Exp. Inc.*, 368 F.3d 776, 786 n. 4 (7th Cir. 2004)). Landry's background evidence must therefore be considered for this purpose at summary judgment.[10] *See, e.g.*, *Henderson v. Shulkin*, 720 F. Appx. 776, 783–84 (7th Cir. 2017).

---

[10] As explained in Part I.B in the text, the Local Rule 56.1 fact statements and responses raise numerous evidentiary objections not considered by the court at summary judgment. Nothing in this opinion should be taken as implying a view about any evidentiary arguments the parties may raise at or during trial.

As additional support for her retaliation claim, Landry quotes the definition of adverse employment action and cites, without meaningful discussion, four paragraphs of her statement of additional facts. Mem. Opp'n. Mot. Summ. J. 14–15 (citing SAF ¶¶ 32–36). Landry cites no specific case applying the general retaliation standard and does not discuss the facts on which she relies in any detail, effectively leaving it to the court to assemble her arguments from her statement of additional facts. Indeed, Landry's factual citation covers nearly all of the alleged conduct about which she complains following her non-selection in 2015. *See* SAF ¶¶ 32–36. This includes: (i) the setting of Landry's 2016 LTI payment at 95%; (ii) Stone's asking Landry to re-schedule cochlear implant surgery to accommodate Stone's vacation plans; (iii) Stone's writing Landry a "disciplinary-sounding" email on September 29, 2016, after Landry told Stone that she believed her hearing loss was impeding her career advancement; and (iv) Abbott's initial payment of a pro-rated LTI benefit to Landry in 2017 because she was on leave for her surgery. *See id*.

In the first place, Landry has waived any reliance on these facts by failing adequately to develop her arguments that they amount to materially adverse employment actions. *See, e.g.*, *United States v. Beavers,* 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." (citing *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir.2009)); *see also Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir.2005) ("It is not our job to do the legal research that Bretford has omitted."); *United States v. Amerson*, 185 F.3d 676, 689 (7th Cir. 1999) ("Given our adversarial system of litigation, it is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel" (quotation omitted).

Looking briefly at some of the acts Landry cites (but does not discuss in her brief), it is not difficult to see how Landry could view Stone's request to re-schedule her surgery as petty. However, Landry points to no materially adverse harm to her career prospects flowing from Murray's request or the re-scheduling. *See* Resp. to SAF ¶ 34. But "petty slights or minor annoyances that often take place at work and that all employees experience" do not amount to materially adverse employment action in the retaliation context. *Burlington N.*, 548 U.S. at 68.

As for Stone's "disciplinary sounding email," there is no evidence that Landry was disciplined in connection with the message or that it affected her career prospects (she has since received a pay increase). *See* Resp. to SAF ¶ 36; Resp. to SOF ¶ 68. Similarly, it is undisputed that Landry ultimately received a full LTI payment for 2017–albeit after complaining to Abbott's Chief Executive Officer. Resp. to SAF ¶ 35. The Seventh Circuit has explained that, in this context, "Federal law protects an employee only from retaliation that produces an injury, and by themselves, these threats did not." *Poullard,* 829 F.3d at 856 (internal citation and quotation omitted) ("While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation." (collecting cases)); *see also Fields v. Bd. of Educ. of City of Chi.*, 928 F.3d 622, 626 (7th Cir. 2019) (holding that "performance improvement plans, even though they had the potential to lead to termination or other discipline, are not" a materially adverse action) (citing *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011)).

To recap, Landry has narrowed her discrimination and retaliation claims to the failure to promote her in 2015 to Director of Crisis Management. Her retaliation claims are dismissed to the extent they rely on other retaliatory actions briefly mentioned in her memorandum. Resp. to

SAF ¶¶ 32–36. Other acts outside the limitations period may be considered as background evidence.

### B. Choice of Frameworks

In its opening memorandum, Abbott asks the court to analyze the summary judgment evidence using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Mem. Supp. Mot. Summ. J. 7, ECF No. 53. Landry responds that, after *Ortiz v. Werner Enterprises Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016), the court should bypass *McDonnell Douglas* and consider "all relevant evidence." Mem. Opp'n. Mot. Summ. J. 4–5, ECF No. 62. Landry walks through the steps of the *McDonnell Douglas* framework in the alternative; she relies on the same evidence under both frameworks. *See id*. at 7–10, 12, 15. In its reply, Abbott offers a similar set of alternative arguments under "the *McDonnell Douglas* framework" and "the *Ortiz* framework" in reply. *See* Reply 4-15, ECF No. 80.

> Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing that "(1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer['s] legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 234 (7th Cir. 2014) (internal quotation marks omitted), overruled on other grounds by *Ortiz*, 834 F.3d at 765. "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*.

*David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017) (alteration in original). After *Ortiz*, "a plaintiff may utilize the *McDonnell Douglas* 'burden-shifting framework.'" *McDaniel v. Progressive Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019) (quoting *David*, 846 F.3d at 224). But "the *McDonnell Douglas* framework is not the only method plaintiffs may use to prove their claim. '[It] is merely one way of culling the relevant

evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's' age or another proscribed factor." *Id.* (quoting *Johnson v. Advocate Health and Hosp. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). Regardless of how the plaintiff proceeds, *Ortiz* teaches that "the court must consider all evidence to decide whether a reasonable jury could find that the plaintiff suffered an adverse employment action because of her age" or another prohibited factor. *Id.* (quoting *Skiba v. Ill. Cent. R.R. Co.,* 884 F.3d 708, 720 (7th Cir. 2018)).

In the response and reply memoranda, the parties analyze the evidence under the *McDonnell Douglas* framework and "as a whole" under *Ortiz*. The court finds the *McDonnell Douglas* framework helps to focus the issues here, which primarily concern pretext. However, in conducting the following analysis the court analyzes the evidence holistically. *See, e.g.*, *McDaniel*, 940 F.3d at 369–70.

### C. Prima Facie Case

The black-letter elements of a prima facie claim of retaliation are similar to a discrimination claim: "a plaintiff must show that (1) he engaged in protected activity; (2) he suffered a materially adverse employment action; (3) he was meeting his employer's legitimate expectations; and (4) he was treated less favorably than similarly-situated employees who did not engage in protected activity." *McDaniel*, 940 F.3d at 369–70 (quoting *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016)) (age discrimination); *accord Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601–02 (7th Cir. 2011) (ADA retaliation claim). The plaintiff must also establish that "retaliation was the 'but-for' cause of the adverse action, 'not merely a contributing factor.'" *McDaniel*, 940 F.3d at 370 (quoting *Barton*, 662 F.3d at 455).

The first three elements are not at issue. Landry applied for the job, and Abbott selected Stone, thereby rejecting Landry's application. Resp. to SOF ¶¶ 45–46. The parties agree that Landry had a qualified disability and that she was more than 40 years old, which is the pertinent age under the ADEA. Resp. to SAF ¶ 1.

The parties disagree about whether Stone and Landry were similarly situated to each other. *See* Mem. Supp. Mot. Summ. J. 10–12, ECF No. 53; Mem. Opp'n. Mot. Summ. J. 8, ECF No. 62. The parties focus on the wrong legal test. The Seventh Circuit employs a more specific prima facie test case in failure to promote cases. The fourth element requires an inquiry into the candidates' qualifications: (1) the plaintiff "is a member of a protected class," (2) the plaintiff "was qualified for the position sought," (3) the plaintiff "was rejected for the position," and (4) "someone outside the protected class who was 'not better qualified' was hired instead." *Barnes v. Bd. of Trs of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020) (quoting *Riley v. Elkhart Cmty. Schs*, 829 F.3d 886, 892 (7th Cir. 2016)). The parties' arguments at the prima facie stage concern the same issue raised at the pretext stage, namely whether Graves's belief that Stone was better qualified was his true reason for selecting her. Robinson testified that he considered Landry qualified to be Director of Crisis Management. Resp. to SAF ¶ 7. The court has reviewed the list of qualifications on the published job description for the Director of Crisis Management position, and both Landry and Stone meet a plurality of the qualifications.[11] *Compare* Job Description, 1144–1146, ECF No. 64, at 1636 *with* SAF ¶¶ 1, 27. This evidence at least creates a fact issue sufficient to support Landry's prima facie case.

---

[11] Landry asserts in her statement of additional facts that Stone admitted that she was not qualified. SAF ¶ 27. Not so. It is undisputed that Stone lacked experience doing certain things listed in the job responsibilities section of the job description, but Landry cites nothing approaching a concession that she did not meet the job's minimum qualifications. *See id*.

### D. Legitimate, Non-Discriminatory Reason

Graves testified that he decided to hire Stone because he believed that she had superior "leadership skills."  Resp. to SOF ¶ 47 (citing Graves Dep. 206:22–208:8).  Graves felt that these skills better qualified Stone to combine her existing responsibilities with the Director of Crisis Management role.  *Id*.  "Selecting someone that [the] employer honestly believes is better qualified for [the] position is [a] legitimate nondiscriminatory reason."  *Barnes*, 942 F.3d at 389 (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838–39 (7th Cir. 2009)).

Abbott also points to specific facts that explain how Graves formed his opinion."  *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 413 (7th Cir. 2018) (citing *E.E.O.C. v. Target Corp.*, 460 F.3d 946, 957 (7th Cir. 2006)) (explaining that employer must make this showing to discharge its burden at the second *McDonnell Douglas* step).  It is undisputed that Stone was directing Abbott's Business Risk Intelligence Group when she was hired.  Resp. to SOF ¶ 46.  Meanwhile, Landry had not managed others since at least 2009.  *Id*. ¶¶ 8–9 (undisputed).  Furthermore, earlier in 2015, Graves had been involved in the decision to remove Landry from her role managing the GCC, and he heard complaints about Landry's leadership style from Pearson and others in the GCC.  Mem. Supp. Mot. Summ. J. 12 (citing SOF ¶¶ 21–27).  Accordingly, Abbott has carried its burden to articulate a legitimate, non-discriminatory reason for selecting Stone.

### E. Pretext: Evidence Considered As a Whole

Under *McDonnell Douglas*, the burden falls on Landry to point to evidence that would permit a jury to find that Graves's reason for selecting Stone was a pretext for a discriminatory or retaliatory motive.  *See Oliver*, 893 F.3d at 413.  "To survive summary judgment here, 'the plaintiff need only offer evidence that supports an inference that the employer's

nondiscriminatory reason for its action was dishonest.'" *Id.* (citing *Target Corp.*, 460 F.3d at 960). "[P]retext is a lie—'a phony reason for some action.'" *Riley*, 829 F.3d at 894 (quoting *Smith v. Chi. Transit Auth.* 806 F.3d 900, 905 (7th Cir. 2015)); *see also Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . .A court cannot interfere because an employer's decision is unwise or unfair.").

Landry first argues that a jury could find that Stone's promotion was intended to be a temporary device to stop her from getting the job. Mem. Opp'n. Mot. Summ. J. 9. Landry cites the re-organization in 2017 in which certain of Stone's responsibilities were given to other employees, leaving her with a set of responsibilities similar to her role before she became Director of Crisis Management. *See* Resp. to SOF ¶ 58–59. The reorganization occurred about a year after Stone became Director of Crisis Management, and Abbott again realigned some of Stone's former responsibilities in October 2017. *Id.* ¶ 60. Landry essentially speculates about Abbott's reason for the reorganizations.[12] *See* Mem. Opp'n. Summ. J. 8. A plaintiff's unsupported speculation about her employer's state of mind cannot create a fact issue at summary judgment. *Widmar*, 772 F.3d at 463 (collecting authority).

Landry next asserts that her superior credentials and experience permit an inference of pretext. Mem. Opp'n. Summ. J. 8–9. The parties agree that Landry possessed extensive subject matter experience, serving in a crisis management role at Abbott since 2009. Resp. to SAF ¶ 2. She holds certification as both a Master Business Continuity Practitioner and as an Associate Fellow of the Business Continuity International accrediting organization**.** *Id.* Additionally, there

---

[12] Furthermore, although the court does not weigh the evidence at summary judgment, the notion that Abbott reorganized several departments and hired a new Director of Security in order to thwart her career borders on paranoia.

is evidence that Robinson, who left the role of Director of Crisis Management, told Graves that he considered Landry to be one of the two people most qualified to replace him. *See id.* ¶ 7. On the other hand, Abbott does not dispute "that Stone had no prior experience in developing strategies specific to crisis management, no experience with the oversight of development of crisis management plans, no prior experience [with] corporate oversight of policies related to crisis management; and no involvement in assessing whether Abbott's business units met the metrics for compliance with Abbott's crisis management policies." *Id.* ¶ 27.

Landry's problem is that she points to no evidence explaining why her credentials and experience clearly trump Stone's perceived leadership skills. Where the employer claims that it hired the most qualified candidate, differences in applicants' qualifications do not on their own create a fact issue on pretext "unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified." *Oliver*, 893 F.3d at 413 (quoting *Deines v. Tex. Dep't. of Protective and Regulatory Servs.*, 164 F.3d 277, 279 (5th Cir. 1999)); *see also Joll v. Valparaiso Cmty. Sch.*, No. 18-3630, 2020 WL 1316688, at *9 (7th Cir. Mar. 20, 2020) (discussing limitations of this rule). Graves testified that after reviewing the candidates "[he and Murray] weren't really finding the right individual." Graves Dep. 159:15–16, ECF No. 64, at #1508. He explained their interest in Stone by stating that she was a "nonentity, meaning that she had a good relationship with [Murray]. Good relationship with [Pearson] and could have a good relationship with [Graves]." *Id.* at 159:21–24. He further stated that he believed Stone could learn "the technical aspects of the job." Graves Dep. 206:22–208:08, ECF No. 55-2, at #726. Landry points to no

evidence showing that Graves's judgement was so clearly wrong that no reasonable person would have reached it.[13]

What evidence in the record the court can find, even viewed favorably to Landry, tends to support Graves's opinion on the relative importance of crisis management experience and certifications. Despite her qualifications and experience, Landry's manager felt it was important for her to complete the same training as the employees she supervised when she began managing the GCC. *See* Resp. to SOF ¶ 22 (undisputed).

Landry's next argument hits home, however. "One can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision."[14] *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003) (collecting cases). A jury could find that Graves's "leadership skills" explanation emerged for the first time in this litigation. Landry has submitted evidence that in 2015 Graves told Landry that Murray "hate[d]" Landry, or at least, as Graves testified, "would hate [Landry] in [the Director of Crisis Management] position." Resp. to SAF ¶ 21 (internal quotations omitted). For instance, Graves told Landry on October 28, 2015, "[i]t can't be you, Corlis [Murray] hates you." *Id.* (quoting Landry Dep. 177:6, ECF No. 63, at #943) (first alteration in original).

---

[13] The job description lists a multitude of formal job qualifications. Examples include "International experience with an understanding of global manufacturing and commercial operations . . .[p]roven leadership skills and the ability to make good decisions quickly based on limited information . . . [n]etwork of global contacts in crisis management and disaster preparedness . . .enterprise risk management and business continuity planning," ECF No. 64, at #1636. The qualifications appear to be aspirational, and a review of Landry and Stone's [undisputed credentials and work history] confirms that neither met all of the stated qualifications. Thus, Graves and Murray were left to weigh the relative strengths of two candidates who possessed differing skill sets meeting only some qualifications.

[14] But see *Schuster v. Lucent Tech. Inc.,* 327 F.3d 569, 578-79 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext. But the explanations must actually be shifting and inconsistent to permit an inference of mendacity" (citing *Rand v. CF Indus.*, 42 F.3d 1139, 1146 (7th Cir.1994) (internal citation omitted)).

Relatedly, Murray denied making the statements Graves attributed to her. Resp. to SAF ¶ 22. So a reasonable jury could conclude that Graves contrived Murray's hatred of Landry as an excuse not to hire her. *See id.* "If the jury does not believe the employer's explanation for its decisions, it may infer that the employer is trying to cover up discrimination, particularly if disbelief is accompanied by a suspicion of mendacity." *Joll*, 2020 WL 1316688, at *8 (internal citations and quotations omitted).

With inferences in Landry's favor, considerably more evidence of pretext exists, depending on which, if either, of Graves's explanations the jury believes. If Graves's opinion of Landry's leadership skills was the basis for his decision, the jury could find that he formed that opinion based on conversations with Pearson, Nix, and Cottrell, among others, about Landry's tenure in the GCC. *See* Resp. to SAF ¶ 13. From the notes of their interviews with Olson, each expressed negative impressions about Landry's leadership in the GCC, but hostility to being managed by a person with hearing loss tainted their evaluations. *See id.* ¶¶ 12–13. Nix and Cottrell both expressed concerns that Landry could not lead effectively because she could not immediately respond to an alarm on the radio, even though there is no evidence that this was an essential requirement of the job or that a simple accommodation could not be made. *See id.* Although Nix, Pearson, and Cottrell also raised other legitimate concerns, "summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action." *Alexander v. Wis. Dep't. of Health and Family Servs.*, 263 F.3d 673, 684 (7th Cir. 2001) (quoting *Eiland*, 150 F.3d at 752) (alteration omitted); *see also E.E.O.C. v. Olsten Staffing Servs. Corp.*, 657 F. Supp. 2d 1029, 1035–38 (W.D. Wis. 2009); *cf. Casna v. City of Loves Park*, 574 F.3d 420, 423, 427 (7th Cir. 2009) (holding that a trial was required on a retaliation claim where

co-worker's perceived "inconsistencies" in the plaintiff's hearing abilities and asked "[h]ow can you work [in a clerical position] if you cannot hear?").

If the jury instead believes that Murray's hostility to Landry motivated the decision not to hire her, it could then rely on Murray's comment that "you do not replace a mature worker with a mature worker" to find that age bias infected the decision. Resp. to SAF ¶ 18. Abbott labels this a "stray remark" and argues that it should be disregarded because Murray made it over a year before the hiring decision at issue and because Murray was responding to a question about hiring people in the skilled trades. *See id.*; *see also generally Joll*, 2020 WL 1316688, at *10 (describing the purpose and limits of the "stray remarks" doctrine). Abbott explains in its briefing that Murray was expressing concerns about replacing specific skilled workers and investing in training older workers, and her comments should be understood in that limited context.

But at summary judgement, the evidence that Murray deliberately paused and stated, "Don't go telling HR on me" must be accepted as true. A jury could therefore find that Murray intended her remark to be taken broadly. *See* Resp. to SAF ¶ 18. "[A] remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." *Joll*, 2020 WL 1316688, at *10 (citing *Emmel v. Coca-Cola Bottling Co. of Chi.*, 95 F.3d 627, 632 (7th Cir. 1996); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 710 (7th Cir. 2013) (jury could weigh evidence of discriminatory remarks made over a year before the employment decision with other evidence of pretext). Here, the question of how generally, or narrowly, to take Murray's comments must be answered by the jury, not the court at summary judgment. *See Joll*, 2020 WL 1316688, at *10; *Huff v. UARCO, Inc.*, 122 F.3d 374, 384 (7th Cir.

1997) ("task of disambiguating ambiguous utterances is for trial, not for summary judgment") (quoting *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1997)).

Abbott next attempts to isolate Murray's 2014 statement about mature workers as her only evidence of pretextual age discrimination. If Murray's "mature workers" remark was Landry's only evidence, Abbott might well prevail, for "remarks unrelated to the employment decision in question may not overcome summary judgment if they stand alone as evidence of the employer's discriminatory intent." *Huff,* 122 F.3d at 385 (citations omitted). Murray's remark cannot be sequestered; it must be considered with all the other evidence, discussed throughout the pretext analysis, that the reasons given for selecting Stone over Landry were not Abbott's real reasons. *See Joll*, 2020 WL 1316688, at *9 (emphasizing, in reversing entry of summary judgment for an employer, that "Evidence must be considered as a whole") (quotation omitted). To cite additional examples of evidence supporting a pretext finding not already discussed, Abbott points to no evidence indicating that Murray had any legitimate reason to dislike Landry. *See* Mem. Supp. Mot. Summ. J. 13, ECF No. 53. The parties agree that Stone was fifteen years younger than Landry. A significant difference in age can be probative of pretext, as can the evidence, with favorable inferences, that Landry possessed superior crisis management experience and certifications (*see* Resp. to SAF ¶ 2). *See Olson v. N. FS, Inc.*, 387 F.3d 632, 636 (7th Cir. 2004). And again, Graves's shifting explanation for selecting Stone further supports denying summary judgment. *See Joll*, 2020 WL 1316688, at *9 (decisionmaker's "shifts in relevant qualifications" favoring people outside the protected category indicated pretext).

Because Murray's remarks about replacing mature workers considered cumulatively with all of the other evidence require a trial, the stray remarks doctrine does not apply here.[15]

Finally, the jury also may believe neither of Graves's proffered explanations. In that event, the September 29, 2016, email exchange between Graves and Stone could lend support to a finding of retaliatory intent. Evidence of statements made by a decisionmaker after the adverse employment decision can be probative of improper intent; the statements must be considered in context and should generally be tied to the decision at issue. *See Skiba*, 884 F.3d at 721–22. In an email, Stone references Graves's warning her that Landry would "use her harassment tactics (discrimination over her hearing issues)," calling an email Landry sent earlier that day an example. Resp. to SAF ¶ 28. Graves replied, "Yup." *Id*. From the email, the jury could find that Graves previously warned Stone about Landry's use of "harassing" complaints of discrimination, suggesting a retaliatory mindset. And on this record, it would be reason to conclude that the warning referred to Landry's complaints against Graves and others about the GCC and the hiring process at issue here.

The last incident of alleged discrimination about which Landry complained on this record was her non-selection for the Director of Crisis Management position. Seen favorably to Landry, Graves's efforts to downgrade her 2015 performance review around the time she was being considered for that position further supports an inference of discriminatory or retaliatory intent. *See id*. ¶ 25. Considering this and the other evidence together, a reasonable jury could tie

---

[15] Landry has offered some evidence that she contends demonstrates a pattern at Abbott of passing up older employees in favor of younger ones for promotions to senior roles. *See* Resp. to SAF ¶ 20 (citing Josephson Decl. Ex. C, ECF No. 76). Abbott counters that the evidence Landry cites does not support her contention. *See id*. The court need not, and does not, consider this evidence because the arguments on this complex issue are poorly developed in the briefing, and a fact issue exists with or without this evidence.

Graves's warnings about Landry's "harassment" to his decision not to hire Landry to be Director of Crisis Management.

Abbot makes much in its briefing of the fact that the only protected activity in which Landry engaged prior to the decision at issue occurred many months earlier, in February 2015.[16] Mem. Supp. Mot. Summ. J. 16. Generally, "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." *Coleman v. Donahoe*, 667 F.3d 835, 861 (7th Cir. 2012) (quoting *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011)). But as discussed in the previous paragraph, Landry does not rely on timing alone, so the general rule does not apply here. *See id*. at 661–62 (explaining that suspicious timing can be used as one piece of circumstantial evidence of discriminatory intent); *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 643 (7th Cir. 2002) (plaintiff does not need *McDonnell Douglas* if he has other sufficient evidence of discriminatory or retaliatory intent).

In summation, with inferences favorable to Landry, a reasonable jury could conclude that Abbott's stated, and shifting, explanations for failing to promote her are pretexts for retaliatory and discriminatory motives. Although certain evidence would not require a trial when considered in isolation, the summary judgment evidence must be viewed holistically and in the light most favorable to Landry.

## IV. Conclusion

For the reasons stated, Abbott's motion for summary judgment is granted in part and denied in part. Landry's claims are dismissed to the extent she relies on adverse employment

---

[16] Abbott and Landry assume that Landry's complaints of discrimination concerning the treatment she received while managing the GCC are protected activity. *See Lord* v. *High Voltage Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).

actions other than the failure to promote her in late 2015 to Director of Crisis Management. Because the summary judgment evidence, considered as a whole and in the light most favorable to Landry, permits inferences of discriminatory and retaliatory motive for that decision, Abbott's motion for summary judgment is denied in all other respects.


Dated:  April 13, 2020                                    _____/s/_____
                                                          Honorable Joan B. Gottschall
                                                          United States District Judge